Case No. 14-1553, 1554, 1555, 1556, 1557, and 1558. James Holland Jr v. Steven Rivard. Oral argument not to exceed 30 minutes per side. Matthew Brown for the appellant. You may proceed. Mr. Brown, you've got six cases here. I assume that since there's complete overlap with respect to one big issue that you're just going to present all of these. And the parties are the same and the lawyers are the same. I assume that unless you have a different suggestion, you're going to go for up to a half hour minus whatever you reserved for rebuttal. And he's going to do a half hour and you'll cover all the issues that are relevant. Is that what you're planning to do? Yes. Good morning, Your Honors. I see this. You're right. Is that right or not? I'm trying to get how the time is divided. Well, there are six cases, but there's really one essential issue that we're here about today and it has to do with the voluntary. You're okay with a half hour, half hour way of dividing this up? Very much so. Okay, great. We'll do it that way then. Thank you. And as I stated, Your Honor, good morning again. We are here to, we're appealing, the appellant is appealing the decision of the district court to deny the writ of habeas corpus with respect, really, that the essential issue in this case was the voluntariness of the confession that occurred. And we know that a lot of the facts are not seriously in dispute that led up to it. We know that Mr. Holland turned himself in on a parole violation, something completely unrelated, at which time he was moved from Jackson, Michigan, from the penitentiary, as I understood it, to the Washtenaw County. I think he went to the state police. They began questioning him regarding a series of unsolved rape cases, at which time he received his Miranda warnings. And they said somewhere around two hours into that, he said, I would like an attorney. And at that point, the questioning stopped. And that was it. And they brought him back to Jackson. Then seven days later, he was brought back to be questioned on an unrelated matter, that being the Lisa Shaw murders. And because he had given a statement prior to that, he was a witness to the murder. So that second seven-day-later meeting, though, I mean, that had to happen, right? I mean, because wasn't there a trial coming up? There was a trial coming up, and that had to happen. So, I mean, maybe one way of thinking about this is how the prosecutors should have handled this differently. Right. You've got a trial. You have speedy trial rights. You've got to do the other trial. It's certainly not improper to interview witnesses for a trial. And he was going to be the lead witness, right? As I understand it, yes, Your Honor. Okay. So how do they do this differently? Well, I think the way they have to do this differently is they have to afford him his constitutional right to counsel when he asks for it on January 6th. Because at that point, the case law is clear that you don't ask him any more questions until you get him an attorney. And we know from the Supreme Court ruling that once you make that request, they came up with a bright-line rule in the Shatzky case, you've got 14 days that that continues, that right to counsel. And you don't ask him any more questions. Further, there's case law that says you don't ask him any more questions. You don't investigate any other crime. And I believe that that was the Dupree case. So your answer to the what should they have done differently is postpone the other trial? No, Your Honor. I think what they should have done is they should have gotten him an attorney and let him confer with an attorney so that they could have satisfied his demand for an attorney on his constitutional right. That became problematic because... He didn't have an attorney for the first? He did not. He did not. And he asked for one. And they did everything. I would stipulate they did everything right the first time because they said, you know, all right, fine. We've got to stop talking to this gentleman because he's asked for an attorney. The problem was is that only seven days later they've got him back. Now, remember, they're questioning about crimes that they thought he was involved in, so he's a suspect. And we know from the case law that you can't ask him any other investigative questions until you satisfy that constitutional right. So that became very problematic at that point when they brought him in. Now, Judge Lawson says that it's okay because he wasn't in Miranda custody. He was in custody. We all know that he was in custody, and there's no question. But we know recent case law, the 2012 case by the Supreme Court, said the fact that you're in custody is not dispositive. You have to be in Miranda custody. So it's the nature of the custody. And I think that's where I have a big problem with the district court's decision because he's in custody. He is not, I believe it was the House case.  And they took him out of his cell and brought him into a conference room within the same prison. They questioned him for seven hours, and then ultimately they just said, you know, they kept telling him you're free to leave, which, by the way, they never told my client he was free to leave, although admittedly on that January 12th they did Mirandize him. But we know from the case law that merely Mirandizing somebody doesn't cure the failure to fulfill that earlier constitutional duty to provide him an attorney. So that becomes very problematic. So to really answer your question the long way around, it is, yeah, they could have cured that problem simply by letting him confer with an attorney, satisfy that constitutional right, then go ahead and question him about the Lisa Shaw murder. They didn't prevent him from talking to an attorney. Edwards requires you to stop talking, which they did. But, Your Honor, they have him in custody. He's not free to make phone calls and get attorneys. He's asked them to get him an attorney. He can't afford one. They need to afford him one. They didn't do it. That case. Well, you're talking about with respect to the Lisa Shaw murder case. But what I'm arguing, Judge, is this, is that any investigation, any further investigation by the police, they've got to give him an attorney at that point. He's being interrogated. Even Judge Lawson found, oh, he's being interrogated all right because the Court of Appeals in Michigan tried to say he wasn't being interrogated. But I agree with Judge Lawson. He was being interrogated, essentially. But he said it was okay because he wasn't in Miranda custody. And my argument is that he was in Miranda custody because he was taken from the jail, unlike in the House case that Judge Lawson talks about. In this case, you know, he's in jail. They're moving him from Jackson, Michigan, over here. Then they're not sending him back to his cell to sleep. They're sending him, put through him in a holding cell for the night. They brought him back. And you have to look at the backdrop of this guy is that before he turned himself in on the parole violation, he was addicted to drugs and alcohol, which is made part of the record. So he's strung out. He's not getting his drugs, so he's under pressure. Now they've brought him in. They've questioned him a total of seven hours over those two days, from January 12th to January 13th, during which time they'd Mirandized him. But again, as I said, that doesn't matter under the law. They still need to fulfill that earlier obligation. They would have been fine if it had been 14 or 15 days later, according to the U.S. Supreme Court. So I think that they have a huge problem there. So once you get to that point, you know, you've got this guy in this situation where he ñ they never said you're free to leave. Where's he going to leave? He's going to go ñ wherever he's going, they've got to take him there, and they've got to put chains back on him, and they've got to lead him out, put him in the van, drive him back, and go through that whole procedure. Which, by the way, one of the reasons he was brought over also was to arraign him, so he had another legal proceeding going on. He's being arraigned on this parole violation at the same time. So he's very much in custody, very much under control of the state at that point. So for those reasons, I believe that they violated his right to counsel, and as such the entire confession is tainted, and it violates the rules set forth by the U.S. Supreme Court. How do you distinguish Howes v. Fields? Well, and again, I think you distinguish it by ñ and that is the key here. It really is. Distinguish our case from Howes. If you follow Judge Lawson's analysis, which I thought up to that point I agreed with, but the problem there is this, is that in Howes, the defendant's already in prison. All they did is they took him out of his cell and brought him in a conference room within the same prison. The doors left open. They told him, hey, you're free to leave any time you want. In our case, they never told him you're not free to leave. They gave him his Miranda rights, but they never said you're free to leave. You're free to stop talking whenever you don't get a lawyer. That's what a Miranda right is, right? I mean, that must have been what was in the Miranda warnings, right? That you're free ñ You can stop talking until you get a lawyer, basically. I wasn't there. I'm not sure what they were saying, but assuming for the purposes of this argument that they gave him his Miranda rights, yeah, they told him those things. You're right. It's not the same thing as saying you're free to leave, but it's not like they're affirmatively suggesting that he has to answer the questions either. All right. In fact, I understand they didn't turn to the issues that he was tried for until he said he had aces up his sleeve. Right. But I think, you know, you look back at the backdrop, even Judge Lawson talks about in his opinion that, you know, you're talking about in this particular case, you have a polygraph examiner who's a veteran police officer. He's a veteran at talking to people and knowing how to get information. That's what he does. And a lot of crimes are solved that way when done correctly. And these crimes, I guess, were essentially solved. But we say it wasn't done correctly because doing a lot of subtle things, as we had argued in our brief, he was discussing with him, hey, listen, you know, we'll get this wrapped up. We'll try to let you see your mom and your fiance. Obviously, he was feeling pretty anxious. He's coming down off these drugs. He wants to see his mother and his fiance. And they're kind of promising him these things, and they're talking to him, and they're smoothing it over with him, and we just want to clear it up. Over seven hours, over two days, they're traveling, and he's going from place to place, going from prison over to the jail, back over to court, and back and forth. He's not really – it's not like the door is open. Hey, you can go back to your cell. You're all done. At that point, it's a pretty coercive situation. And that is exactly what we talked – what the court, the U.S. Supreme Court, talks about, and Miranda especially, is that's what we look at. Is there some coerciveness to this? Is there some adhesiveness to it? And I think that there is under those circumstances. Let me say, this is an AEDPA. AEDPA applies to this, right? I mean, an overall AEDPA requirement. Yes. So we're not here really to decide would we have reached the same conclusion that the state court did. I mean, we've got to effectively say that no reasonable jurist would agree with what the state court did here, right, in denying habeas corpus relief. I mean, if any reasonable jurist could say, well, maybe I wouldn't agree with it, I might have done it differently, but I can see where some reasonable jurist could agree with the state court, we're obligated to affirm, are we not? The problem I'm struggling with, Your Honor, to answer your question, the reason I'm struggling with this when I think about this is that the U.S. Supreme Court says, look, once somebody has asked for an attorney, you've got to get that person an attorney within 14 days. Then he has to start asking again after that point. So we're within that seven days. So we have to square that. They didn't follow that rule. I've also explained to you, and we've cited cases in our brief saying, look, the fact that you could possibly, well, let me back up. You're within the 14 days. We agree with that. We also agree that you cannot continue to question somebody on that issue or any other investigation. So I would think that would have applied to this. They're saying, well, look, I didn't want to talk to him about those earlier crimes, which we think he committed and we're asking him about. This is a very accusatory situation. We're going to talk to you about the Lisa Shaw murder. But as we said, the case law says you don't talk to him about any investigation until you fulfill that deed. Can I ask a question that follows up on Judge Gilman's question? Are you agreeing that the issue is basically whether it would be an unreasonable application of house to find against your client, or are you claiming that we just apply house directly and see whether it applies or not? Do we have to question whether it would be unreasonable to apply house, or do we ask how does house apply in this case? Does my question make sense? Yes, and I guess I'm struggling with it because I've been reading these cases over and over again, and I still say I've got this fundamental problem with this July 6 date. I need an attorney. That seems to me to go to whether house applies here or not. Okay. I'm trying to get at the threshold question of what standard we use. Do we just determine whether house applies or not as if this were direct appeal, or do we determine whether house applies or not in the same way that we would if the state court had relied upon house, which is different. Right. Right? That's my question. And I guess it depends on whether we can apply epidefference to an issue that the court didn't get to because it found some other issue dispositive. What's the answer to that? I guess the guidance, I guess. What's your answer to that? It's a tough question. And I think the answer is that you do have to look at house, and you do have to say, look, if this thing was a marine. You're not going to answer whether epidefference applies now or not. I think that you might not even get to house. That's what my problem is. I think that you can't get past this constitutional problem that the U.S. Supreme Court has laid out for us. They gave us a nice bright line 14-day rule, and we have to square that up before we ever get to it. Where have they applied that in a setting where there's a person's agreed to be a witness in a case? I mean, it's just the troubling part of this case for me is this happenstance that he's the lead witness in this other case, and it's utterly proper to talk to a witness before trial, including, as it turns out, it's this case, including to make sure the person's not lying. I mean, this interview, the whole thing could have ended very badly, right? He could have gotten up there and lied. Someone else would be in jail. It's this very interview that gets the system of justice working the right way. And so where's Edwards applied in that kind of a setting where this all prosecutors are doing their exact job right, which we're going to make sure that when we put people on before we take people's liberty away, that they know what they're talking about and they're not lying, and doing that very thing leads them to suddenly realize it's somebody else. It's incredibly hard to look at that and think. Anyway, I want to know a case. I want to know an Edwards case where that happened and the court said, no, sorry. They invoked Edwards. It's within 14 days. Don't talk to him or get him a lawyer before you talk to him. I greatly respect and understand your point because it's important to law enforcement. It's important for trial proceedings. Criminal defendants.  Criminal defendants. We prefer to have the right one on trial. Here's the problem that I have with it is that these same detectives, these same investigators, knew. They were looking at him for these other crimes. They knew he had invoked that right, yet they went ahead and they're setting up polygraphs for everything. And I know you're going to say, well, there's something to polygraph to determine whether he was telling the truth.  And I get that. That's a good idea. You agree with that. I agree with that. If someone's going to pin somebody for a murder, let's make sure they're telling the truth. Absolutely. And I agree 100%. But since these same investigators knew, they were looking at him for these other crimes, and they knew he had asked for an attorney, why couldn't they solve this whole problem simply by letting him, fulfilling his constitutional right, let him confer with an attorney? I think there's a lot to the idea that it would have been a good idea. Maybe they should have hired an attorney for him. You talked to them first. You invoked Edwards here. But we've got this trial. We need to talk to you. It would be better if you talked to an attorney first. All makes great sense to me. But where's the case that allows me to say you had to do that on pain of it being an unreasonable application of constitutional laws determined by the U.S. Supreme Court? That's what seems like the big obstacle here. It's definitely an obstacle because I think what we're running into is this conflict between this 14-day rule, which I think is a bright-line rule that clearly applied to him, and then at the same time the need for them to investigate a matter that was going to trial and talk to a witness. But here's what the problem is, is that at some point they could determine that their questioning of this witness, whom they didn't allow him to have an attorney, this questioning of this witness started to change the whole focus of their case on the Lisa Shaw case, but they went forward with it because they were saying, well, he was volunteering the information. But as to that, they Mirandized him. And they Mirandized him. But as I said, as I had indicated to you earlier, and I think it's a Sixth Circuit case, it says that – We're not going to get anywhere with Sixth Circuit cases in EDPA. I mean, our court has been reversed many times for doing that exact thing. All right. Well, let's take that out of the – Aren't I right about that? I mean, isn't the problem we have to measure the constitutional test by U.S. Supreme Court decisions? I think you're right. I think you're right. I just thought that the U.S. v. Dupree case mentioned something that was directly on point, and as far as I can see, it's still good law. And it's just saying the subsequent Miranda waiver doesn't overcome that request for counsel. That's what I think that case stands for. And I don't know if the U.S. Supreme Court has ever said that's not the case. So you can Mirandize him until the cows come home, but you still can't solve this earlier problem that you're stuck with here, is that you've got this 14-day rule the U.S. Supreme Court set up. You can't just ignore that. And they did ignore that, and they went forward with it. And I understand it. I'm up here arguing, saying that they're trying to do their job to prepare for this trial, but in so doing, they've incriminated this person and still didn't afford him his constitutional rights that they're bound to. And for that reason, I think they have a huge problem. As bad a result as it may seem for everyone, it is nevertheless we're bound, bound by what the U.S. Supreme Court says, and they've said this, got this 14-day rule, and it's still carried over. He was still protected, you know, under that Edwards umbrella. He was still protected all the way over to this point where they're taking his, you know, they're questioning for seven hours, only seven days later. I'm sure in Edwards they re-questioned him on the very crime that he ended up being tried on, right? Right, right. So we've got sort of a situation here that really the Supreme Court's never directly dealt with. And I'll tell you, I have read these cases over and over and over again, and I see this conflict between those two things. And at the end of the day, you know, the U.S. Supreme Court says what the law is, and they said what the law is, and it wasn't followed here, and it creates a nightmare. It really does. And unfortunately, I think as a result, I think the confession is no good. His right to counsel was violated. And if that's the case, then I would say that all six convictions were really almost complete, and it's even talked about in here, that that was the confession made to all those cases. A lot of those cases were cold cases that were unsolved until that happened. So I'd have to respect the request, and based on that and based on the U.S. Supreme Court case, I think you have to reverse his convictions. Thank you, Counsel. Does she have any other questions? I mean, I kind of figured we'd kind of go there, but, you know, obviously we have other issues on some of the other cases. Other issues for which there's a certificate. Okay. Thank you, Your Honors. Your Honors, and may it please the Court, I'm Linus Banghart Lynn, Assistant Attorney General for the State of Michigan, on behalf of the Respondent-Warden and requesting affirmance in all six cases. I think I will begin by addressing your question, Judge Rogers, about whether ed pedefrance applies to this claim. And I'll preface it by saying that we win either way, but I will say that ed pedefrance does apply to the claim, and the reason can be found in Harrington v. Richter. And I think the fact that in Harrington v. Richter, the entirety, if I recall correctly, of the California Supreme Court's decision was, I believe, affirmed. I think that was all of it. That's all it said, though. I believe that's all it said, and yet the U.S. Is that different from a case where they say something wrong? It is different from a case where they say something wrong, but the reasoning in Harrington v. Richter, they said we have to look at what reasoning could have, what reasoning, let me get the words right, what reasoning did or could have supported the result reached by the state court, and it is the result. Is that on the assumption that if they say nothing, we can assume that they used some right reasoning? I don't think it is, Your Honor. I think that it is based, I don't think it's based on any such assumption. I think it's based on the idea that if they reached a result that was reasonable, because it is the result and not the reasoning that is subject to epidepherence. Basically, Harrington v. Richter requires epidepherence here is basically what you're saying. As long as the state court addressed the claim, then yes. If the state court addresses the claim, so we have to kind of define what the claim is. The claim, I think, is defined as this confession was involuntary due to an Edwards violation. I think that would be the claim, and I think the state court absolutely addressed the claim. I see. And whether or not the reasoning was correct. That's helpful. Thank you. Thank you, Your Honor. And I would point out, I mean, my brother faulted the Michigan Court of Appeals for not applying Maryland v. Schatzer, which had not been decided at the time they reached their decision. I just wanted to point that out as well. And I agree with my brother counsel that this is the essential issue here. There is the one certified issue in the other case. I think that since he didn't talk about it, I won't either unless the panel has any questions. I think it's covered in the briefing. And I would point out that we covered the procedural default issue in the briefing as well, which the district court did not decide. But, yeah, the essential issue is the voluntariness of the confession. I think that, yes. Are you going on to voluntariness, not the Edwards issue? Well, they both tie into the voluntariness. I mean, whether it is a denial of counsel that rendered it involuntary or whether it was the conditions of the It would be a violation of Edwards without being involuntary, couldn't it? I think it sort of is deemed involuntary sort of as a legal matter. I understand. As a factual matter, right. We're going to talk about the Edwards issue. The Edwards issue, yeah, absolutely. That's, I think, the crux of the case. And I think the answer is, or one answer is, absolutely, that he wasn't in custody for Miranda purposes. House v. Fields can't be meaningfully distinguished. To say that in House v. Fields he was moved from prison to a conference room in prison, whereas here he's moved from prison to a conference room, an unlocked conference room, in the Washtenaw County Jail, I don't see how that, that is a difference. But as far as a distinction where this presents an inherently coercive environment that wasn't present in House v. Fields, that's not clear. How does this case work out, just out of curiosity, if the facts are he's never in jail? So the first time you talk to him, he invokes Edwards and says, okay, fine, you're free to go, enough is enough. Then the second time, you know, we've got this trial, could you come on in? And he comes in just for that purpose. Does the case come out the same way? Exactly the same way, yes. Well, it's easier. Then I'm trying to figure out why all the custody talk makes a difference. Well, because if he's in custody, because what you're proposing is no different as far as whether he's in custody in the second interview. Well, the analysis is different, but the answer is the same, he's not in custody. And so that, so it's important to figure out whether he's in custody. Let's put it this way, each time it's voluntary. Okay. All the way, you know, the whole, it's voluntary all the way up to when he invokes Edwards, and at that point they say, okay, fine, we respect that, you're free to leave. And then the second time they just say, hey, we've got this trial, you're going to be the witness, can we find a time to come in? Right. So it's all voluntary. Does it make a difference? I'm trying to figure out this Miranda custody phrase and all that, and how much work it's really doing here. I just can't figure that out. What I'm not sure if maybe you're asking is the fact that they aren't even, are you kind of asking about the fact that they aren't even interviewing him as to any of these crimes? No, I'm making the point that each one starts out and ends out, ends, well, first one starts voluntary, ends voluntary. Come in, the question gets uncomfortable, he invokes his right to counsel, stops the interview, they respect that, they say, okay, fine. End of story. And he's now back living in his house, hypothetically, his home, I won't say house. And now they call him and they say, hey, you're the lead witness in this case, we'd love to talk to you before the trial. When's a good time to come in? He voluntarily comes in. They just start the conversation, it's a separate issue, it's not even a suspicion of crime, it's about getting ready for this trial to find out what the testimony is going to be. Does it make any difference? I mean, does that fact pattern change any of the analysis? It doesn't, because in both cases, he's not in Miranda custody. Now, in your hypothetical, he's not in any kind of custody, including Miranda custody, but in the facts we have here, he was in custody, but not in Miranda custody. So, yeah, your hypothetical, we don't have to talk about Miranda custody because he's not in custody. But in the facts we have here, we do have to talk about Miranda custody because he was in custody. We can't say he wasn't in custody because he was in prison for crimes he had committed long ago. Being in custody means by definition you're not free to leave, and not being free to leave creates other pressures. Okay, I understand your point. And the reason Miranda custody is different than custody is because the reasoning underlying Miranda is that when you're put in custody, when you're arrested, you say, we think you did these CSCs, you're coming with us, lock you up, and now you're going to tell us about it. That's an inherently coercive environment. And here, there was none of that because he lives in custody. He lives in the custody of the Michigan Department of Corrections, and they just brought him to a conference room in the Washtenaw County Jail, and as you pointed out, to talk to him as a witness in a case. So they didn't even – I heard repeatedly from my brother that they liked him as a suspect in these CSCs, and I don't think that's clear from the record at all. They initially asked him about these CSCs. He didn't answer, and then he invoked, and then I think it's just as clear from the record. I don't think the record is very clear on it, but I think it would be just as reasonable to look from the record and say at that point they said, well, I don't think we're going to get him on these CSCs. We don't have an eyewitness ID, and he's not talking, and so I don't think that they did want to pursue him for those CSCs at that point. But let's say it's not an AEDPA case. Just out of curiosity, why isn't the procedure of the appellant's lawyer suggesting a good one, that if you invoke Edwards, you either just don't talk to him ever again, or if you're going to, you honor it by getting him counsel, even if it's for a separate appearance in trial as a witness, but that that's the good procedure. Why is that not true? Is there something I'm missing about that? Again, I'm assuming it's not an AEDPA case. I don't think you could fault the prosecutor or the Washtenaw County Sheriff's Department if they arranged to get him an attorney. Why shouldn't they be required to do that? Because it's not their job. It's not their job to get him an attorney. As you said, they didn't prevent him from seeing an attorney. He's not in their custody. They send him back to his home. There's no Sixth Amendment right to an attorney when you're a witness. You probably add to that. You probably say that. Yeah, exactly. He was a witness. They had a choice. They could either keep working on him on these CSEs, in which case they need to make sure he gets counsel, or they can forget about the CSEs, which it appears they did, until he brought it up again. And they can say, all right, well, all we've got him for, we've got him, he's in MDOC custody, and he's our star witness in the case against the murderer of Lisa Shaw. And so we don't need to get him an attorney for each moment. You want to make this second meeting seem like they just talked to him about going to a baseball game. It's totally unrelated. Well, it's really not that unrelated, right? I mean, this fellow's in custody. There's a lot of possibilities here. It's unrelated. I think it was entirely unrelated to the five other crimes that we're here about, the two robberies and the three CSEs. It was only related to the murder of Lisa Shaw, and it was only an interview with him as a witness. Now, I'm not going to say it's as casual as a baseball game because they were sort of suspicious of him in terms of he had made some statements and then he had made other statements that were inconsistent with those statements, and they did need to see, are you telling the truth? Are you framing someone up? Are you going to fall apart in front of the jury on cross-examination? Are you going to? There's a lot of concerns here that they needed to address. So it's a serious matter. It's not a casual matter. But as far as him being a suspect in either the Lisa Shaw murder, no, and even less so. With respect to what did he ask for an attorney? I believe it was the CSEs they asked him about, the Karestan. Those are the things that he later admitted to. He later admitted to on his own volition without being questioned about. In fact, the police said before they interviewed him, they said, look, don't talk to him about any of these other crimes. We asked about him. He invoked his counsel. He didn't talk to him about other crimes. After he brought it up. They talked to him. He brought it up, but why shouldn't the rule, again, without it, but why shouldn't the rule be that when you bring up something as to which you've asked for an attorney, then you need to get an attorney. Because Edward says the exact opposite. Edward says that if the suspect reinitiates conversation, then you can talk to him. So with respect to the CSEs, it's a reinitiation? Is that your idea? I would say that it was a reinitiation with respect to the CSEs. Now, the state did reinitiate contact with him. And so in terms of the big picture. It's kind of house plus reinitiation is what your argument is. When you're talking about the CSEs, they, yeah, the state was. CSEs are several of these convictions, right? Three of them. Three of them were CSEs. Two robberies. Well, the CSEs were also robberies. So five robberies and then the murder. So, yes. With respect to the CSE convictions, he's confessed, even though earlier with respect to the same CSEs, he's asked for a lawyer before he gets. . . Yes. So the only rationale for those has to be a reinitiation. It's kind of strange to have a reinitiation while you're talking to him. I guess that's your argument, right? That and that he wasn't in Miranda custody. And Miranda custody is dispositive. But he wasn't in Miranda custody. If it's an Edwards problem, as the district court correctly said, if it's an Edwards problem, we have to look. Was he in custody before or was he in custody after? Because he wasn't in custody after, it doesn't count. So it's really two independent rationales, absolutely. All right. So, again, and the police, the Washtenaw County Sheriff's, when he starts talking about these other crimes, they're not required to put their fingers in their ears. They can listen to what he says. If he wants to unburden himself, there's nothing that prevents them from hearing him out and hearing what he has to say. What is your strongest case, you think, that supports this position? I think the strongest case is House v. Fields. I think our facts are actually better than the House v. Fields facts, if only slightly. And so if the fact is that that wasn't Miranda custody, I think that it sort of follows perforce that this wasn't Miranda custody. House did not involve the Edwards problem, though, of reinitiation. No, it didn't involve that problem. But it's still the fact of custody is dispositive. I mean, if he was in custody, well, we've got the reinitiation argument as well, at least as far as the Lisa Shaw murder. The fact of custody, I think, is dispositive. They're talking to him about this case. And so House v. Fields says this isn't Miranda custody. And I think what you have to look at, I think the key question, there's a lot of factors involved, which, under ed pedeference, means there's a lot of leeway to be afforded to the result reached by the state court. But I think the key question is, why was he even there? And I think that's, in House v. Fields, he was there being questioned about the crime that he was a suspect in and the crime to which he ultimately confessed. And that was argued to be a problem, and it turned out not to be a problem. In here, he was brought in as a witness, the star witness, in a proceeding against somebody else. He wasn't a suspect in any crime at that point, or at least he wasn't brought in as a suspect in any crime at that point. And so I think that's a huge factor among several factors that lead to a reasonable finding and, in fact, a correct finding, that he was not in custody for Miranda purposes at the time of those interviews. I think that covers the points that I wanted to make, other than we're in the brief and that I wanted to respond to. I'd be glad to answer any other questions that the panel may have. I thank your honors, and we request affirmation. Thank you. Counselor, you know, I just had a concern that, you know, your theory, let's just put Edward to the side, might actually be hurtful to criminal defendants. So the way your theory works is if you've got, you're a suspect in a crime, the conversation gets sufficiently nerve-wracking that you invoke your Edward's right, but you're also simultaneously about to be a witness in another case. The way your argument works, that you always have to get a lawyer, and you always have to cure the Edward's problem, means every time this oddity happens, the police can't talk to the client until they've gotten permission to cover everything. That turns out not to be good for the criminal defendant, because the criminal defendant might well want to preserve the right not to talk about that other stuff, but still be a witness in a case and get whatever benefits come from that. So it seems actually kind of perverse and unfortunate, because you want to pull these things together, and I would think most criminal defendants would want to keep them separated, because many are going to want to be witnesses, because that might be the right thing to do, but it also could be helpful to them. That's a great point, Your Honor. And my comment would be that the prosecution has a lot of tools to cure the problem. They could say, listen, we want you to be a witness in this case, and we're willing to give you immunity as to something else over here, or to the extent you might be implicated as a defendant. Now you're saying before they can talk to him about being a witness in the case, they have to grant immunity is the first thing? No, no, no, no. I'm just saying that there's alternatives for them to deal with that situation where they don't have to worry about losing that witness necessarily. This case was unique in that they brought him. But under your theory of the case, he could have come in for the witness thing and said, hey, you invoked your Edwards right. We can't talk to you again. But yet we have this trial, so we're thinking of not using you as a witness. And he's like, well, no, I want to be a witness. And then they say, okay, well, you better talk to a lawyer. Now he has to come back, and in order to talk about the witness testimony, he has to waive his right to talk about the other stuff. Well, again, there are tools available to them. For example, the defendant could waive his right in writing to an attorney in order to provide that testimony to them. He could have done that. That means they could then start talking about? About the other things. The other things. It could be narrowly defined at that point. If they were being true to what they really want to do, is they want to find out about Lisa Shaw, they could have confined their questions to that and said, I don't want to hear about these other things. We're just going to talk about that thing. And I think they would have been okay. But they just opened it all up after he had asked for an attorney. So with respect to Shaw, you still make this argument with respect to Lisa Shaw, right? Now you're saying with respect to her murder, I guess it was, that the re-initiation was okay, it was only with respect to the other crimes that it was not okay? That's what I thought you just said. No, I was saying that they could have tailored their questions that way and not ask about these other things. They said, look, you know. They had only asked about Shaw. All I can ask you about is about Shaw. I can't ask you about these other things. That's all they did, though, right? He brought it up about the aces up his sleeve and then started talking. Right. I understand. It just comes all the way back to the U.S. Supreme Court saying you've got 14 days. Once you've asked for an attorney, you've got 14 days. And even as I said in here, you know, pursuant to Edwards, while the Petitioner is in custody about any investigation because the Fifth Amendment right to counsel is not offense-specific, it matters not that subsequent interrogation focuses on a different crime. Arizona v. Robertson, 46 U.S. 675. So I'm just saying. You have to clarify for me because I thought you agreed to something that I don't think you meant to agree to but maybe you did, which is that if they had only asked about Lisa Shaw's case, then even though he admitted to murdering her, that would have been okay. Did you say that or not? Because I thought you said that. No, I was giving you a hypothetical. I wasn't talking about this case. I was giving you a hypothetical that the prosecution has tools available to them to avoid the problems. You mean what I thought you said? In this case, I'm not saying that at all. I was not saying that, Your Honor. Let me ask you another question. How do you respond to your opposing counsel's argument about Harrington v. Richter? Is he right about that or is he wrong? I think he's wrong about it. Well, what's wrong with it? Because that's what I was trying to ask you before, and I'm not sure I understand what's wrong with it. I don't want to say he's wrong. I just want to say. I don't mean whether he's wrong. I want to know whether Harrington v. Richter apply here or not. I would say no. Well, give me a reason why it doesn't. Because the U.S. Supreme Court has given us a bright-line rule about our right to counsel. I'm not sure Harrington v. Richter only applies to non-bright-line rules. Harrington v. Richter, as I understand it, says we give epidefference to decisions that courts don't make if it would have led to the decision that they did make or something like that. But if they made that decision in violation of my U.S. constitutional right to counsel. Well, if they made it, then it depends on how clearly, not clearly established, but how unreasonable an application it was. That's what epidefference is, unreasonable application, right? Right. I'm trying to ask, do we apply the unreasonable application standard or not? He says, yes, we do because of Harrington. You say it's a violation. That's not answering my question about whether we apply the unreasonable application standard or not. Are you with me? I'm with you. I just feel that you don't get there. You don't get there because of the U.S. Supreme Court's decision. You have to solve that problem first before you get to all these other issues. Thank you, Your Honors. Interesting case that's going to require some cogitation. Thank you for your advocacy, and the case will be submitted.